**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| QUINCY JAMES GORDON, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | _____ |
| | § | |
| HYATT CORPORATION D/B/A HYATT | § | |
| HOUSE HOUSTON/GALLERIA, | § | Jury Trial Demand |
| HOUSTON H GALLERIA OPCO, LP, | § | |
| AND SRE 4610 TX OPCO GP | § | |
| PLEDGOR, LLC, NOOR HASAN, and | § | |
| WENDY L/N/U, | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, plaintiff **QUINCY JAMES GORDON** (hereinafter "Plaintiff"), and files this Original Complaint against defendants, HYATT CORPORATION D/B/A HYATT HOUSE HOUSTON/GALLERIA, HOUSTON H GALLERIA OPCO, LP, SRE 4610 TX OPCO GP PLEDGOR, LLC, NOOR HASAN and WENDY L/N/U (collectively, hereinafter the "Defendants"). In support of such, Plaintiff shows the Court as follows:

## I.  STATEMENT OF THE CASE

1.      This is a civil rights case. The events giving rise to this lawsuit can be summed up as Plaintiff being the wrong race in the wrong place.

2.      On the dates made the basis of this lawsuit, Plaintiff, an African American male, was a paying guest at the Hyatt House Houston / Galleria located in an upscale commercial district at 3440 Sage Rd, Houston, TX 77056 (the "Hyatt Hotel").  Plaintiff was discriminated against on the basis of his race.  Thus, Plaintiff brings several civil rights claims pursuant to 42 U.S.C. § 1981,

§ 2000a, and § 1983.  Additionally, Plaintiff also brings supplemental state law claims including but not limited to false imprisonment, conversion, unjust enrichment, breach of contract, defamation as slander per se and intentional/negligent infliction of emotional distress.

## II.  JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (Federal Question Jurisdiction), 28 U.S.C. § 1343 (Civil Rights Jurisdiction), and § 2000a-6(a) (Title II Jurisdiction Over Violations of Civil Rights in the Provision of Public Accommodations).

4.     This Court also has subject matter jurisdiction over Plaintiff's state law tort claims pursuant to 28 U.S.C. § 1367(a) (Supplemental).

5.     Venue is proper in the Southern District of Texas, pursuant to 28 U.S.C. § 1391(b)(2) since a substantial part of the events and omissions giving rise to the claim occurred in in Harris County, Texas, within the United States Southern District of Texas.

## III.  PARTIES

6.     Plaintiff **QUINCY JAMES GORDON** is an individual and a resident of the State of Texas.

7.     Defendant **HYATT CORPORATION D/B/A HYATT HOUSE HOUSTON/GALLERIA** (hereinafter "Hyatt Corporation") is a Delaware corporation with the mailing address 150 N. Riverside Plaza, Floor 15, Chicago, IL 60606-1598.  It may be served through its registered agent, United States Corporation Co, located at 211 E. 7th Street Suite 620, Austin, TX 78701 or wherever found. Upon information and belief, Hyatt Corporation maintains an ownership interest the Hyatt Hotel.

8.     Defendant **HOUSTON H GALLERIA OPCO, LP** (hereinafter "OPCO") is a Delaware limited partnership with the mailing address 980 N. Michigan Avenue, Ste 1660,

Chicago, IL 60611. It may be served through its registered agent, Corporation Service Company located at 211 E. 7th Street, Suite 620, Austin, TX 78701 or wherever found. Upon information and belief, OPCO is the operating company which manages the day-to-day operations of the Hyatt Hotel.

9.     Defendant **SRE 4610 TX OPCO GP PLEDGOR, LLC** (hereinafter the "GP") is a Delaware limited liability company with the mailing address 980 N. Michigan Avenue, Ste 1660, Chicago, IL 60611. It may be served through its registered agent, Corporation Service Company, at 211 E. 7th Street, Suite 620, Austin, TX 78701 or wherever found. Upon information and belief, GP is the general partner of OPCO which is a limited partnership.

10.     Plaintiff specifically invokes the right to institute this suit against whichever entity was conducting business using the assumed or common name of "Hyatt" with regard to the events described in this Complaint. Plaintiff expressly invokes his right under Rule 28 of the Texas Rules of Civil Procedure to have the name of this party substituted at a later time upon the motion or order of the Court.

11.     Defendant **NOOR HASAN** (hereinafter "Hasan") is a Texas resident and may be served at 1301 N. AW Grimes Blvd, Apt 1328, Round Rock, TX 78665 or wherever found.

12.     Defendant **WENDY L/N/U** (hereinafter "Wendy") is a Texas resident and may be served at her last known place of employment, Hyatt Hotel Houston/Galleria, at 3440 Sage Road Houston, TX 77056 or wherever found.

### IV.     MISNOMER/ALTER EGO

13.     In the event any party is misnamed or are not included herein, it is Plaintiff's contention that such was a "misidentification," "misnomer," and/or such parties are/were "alter

egos" of parties named herein. Additionally, or in the alternative, Plaintiff contends that all "corporate veils" should be pierced to hold such parties properly included in the interest of justice.

## V.     BACKGROUND AND FACTS

14.     At all times relevant, Defendants Wendy and Hasan, were employed by either or both, Hyatt Corporation and OPCO, and were acting in the furtherance of their business interests.

15.     At the time of the events made the basis of this lawsuit, Plaintiff was a thirty-one (31) year old African American male residing in Austin, Texas.

16.     On or about May 20, 2020, Plaintiff was visiting Houston and made an online reservation for a room at the Hyatt Hotel.

17.     That evening, Plaintiff arrived at the Hyatt Hotel and tendered payment at the reception desk for his reservation after which he was given his room key.

18.     Plaintiff then returned to his vehicle in the Hyatt Hotel's parking garage and proceeded to transfer his personal belongings and valuables from his vehicle into the safety of his hotel room.  Said personal belongings and valuables included, but were not limited to, crucial prescription medication, cash, jewelry, and electronic devices such as an Apple iPad and an Apple Watch.

19.     The prescription medication was particularly valuable as Plaintiff was required to take them on a daily basis to treat underlying medical conditions. The medication also included, but was not limited to, prescription pain medicine intended to help Plaintiff manage intense levels of pain after having recently undergone invasive back surgery.

20.     After securing his personal belongings inside his hotel room, Plaintiff drove to a nearby Popeyes Chicken restaurant to get dinner.

21.     Plaintiff returned to the Hyatt Hotel with his dinner and parked in the Hyatt Hotel's parking garage, which is gated and requires a room key card to enter. After exiting his vehicle, Plaintiff started walking towards the doorway that connected the parking garage to the hotel with several personal items in his hand. He unassumingly walked past a couple African American women on his way to the exit. However, before he could make it to the exit, a police officer rushed into the parking garage and started yelling at him to stop. Plaintiff, not having the slightly idea as to what was going on, immediately stopped in his tracks.

22.     As the police officer rapidly approached Plaintiff, he asked if Plaintiff was with the other African American women that were in the parking garage. Plaintiff adamantly insisted that he did not know the women and that he was staying at the Hyatt Hotel by himself.  Moments later, the police officer's left Plaintiff and engaged the women.

23.     As he had nothing to do with the women nor whatever they were suspected of doing, Plaintiff immediately sought to distance himself and avoid any affiliation with them by seeking help from Hyatt Hotel's staff as they could corroborate that he was staying there by himself. Therefore, he rushed towards the hotel lobby and on the way dropped off in his room the personal items he had been carrying including his shampoo, two iPhones and wallet which contained his driver's license.

24.     Plaintiff quickly proceeded to the front reception desk and notified Wendy, the manager on duty, of what he had just seen in the parking garage.

25.     Rather than thanking him for notifying her, to Plaintiff's absolute shock and confusion, Wendy loudly scrutinized him and accused him of being complicit with the women in the garage by declaring, "you must have been doing something shady with them." She then quickly

made her way around the reception desk and demanded that he "hurry up, I'm taking you to the police."

26.     Plaintiff, experiencing a rush of shock, anxiety, embarrassment and fear, felt a sudden and immediate need to urinate. Wendy nonetheless pursued Plaintiff into the men's restroom and ordered him to "come out, I am taking you to the police."  Without even being given the opportunity to properly wash his hands Plaintiff was – very publicly – escorted by Wendy out of the restroom through the lobby and out the front door.

27.     As it turned out, the women in the garage had been suspected of theft at a nearby Ulta Beauty retail store. And, instead telling the police officers the truth or at the very least that she was unaware of any association between Plaintiff at the women, *Wendy did the exact opposite*.

28.     Wendy **falsely** accused Plaintiff as being the driver of the women's getaway car, without even the slightest bit of proof rather solely basing her accusation on the fact that Plaintiff, like the women, was also African American.

29.     Wendy's false claims convinced the police officers that Plaintiff was lying when he desperately pled that he was not involved. Plaintiff was immediately taken into custody and driven in a squad car to the Ulta Beauty store where the theft purportedly took place. There, the police officers asked store personnel to identify Plaintiff. But, as expected, they had *no idea* who he was.

30.     One of the police officers approached the suspected women who were also in custody in the back of another squad car. He inquired about Plaintiff's involvement and the women instantaneously responded that they did not know who Plaintiff was and that he had not been with them.  The police officer then asked who the driver of their vehicle was, and one of the women immediately confessed to being the driver.

31.     Since Wendy had purportedly seen Plaintiff driving the getaway vehicle, the police officers were still unconvinced of Plaintiff's innocence. Further, after having relied upon Wendy's statements, by this point, Plaintiff had already been paraded around like a hardened criminal with too many accusations having been made against him to simply let him go.  Therefore, he was charged with somehow "evading arrest."

32.     Plaintiff was taken to jail and forced to spend the entire night in a jail cell. Upon being released the following day, May 21, 2020, Plaintiff took a cab back to the Hyatt Hotel in order to gather his personal items, including his pain medication, wallet and phones, which were still in his hotel room.  The cab driver allowed Plaintiff to use his phone to call Hyatt Hotel's corporate office to request assistance in getting his belongings back and to avoid any further issues upon his return to the Hyatt Hotel.  However, the corporate office was unwilling to assist and instead deferred back to the employees at the Hyatt Hotel.

33.     Plaintiff did not have enough money for the cab fare when they reached the hotel so the cab driver waited for him so he could retrieve his wallet.

34.     Defendant Hasan was the employee at the reception desk. As if he had not already been put through enough, to his disbelief and utter dismay, Hasan inexplicably demanded that Plaintiff pay One Thousand Dollars ($1,000) before the Defendants would release his personal belongings. The reason given for this demand was even more unbelievable. Plaintiff was told that he would have to pay this outrageous sum because of prospective business the Hyatt Hotel purportedly lost the day before due to the police presence on the premises. This, regardless of the fact that the police presence was for an alleged theft that Plaintiff had **absolutely nothing** to do with.

35.     The Defendants' conduct became even more outrageous when Hasan refused to let Plaintiff access his wallet or cash in order to pay the absurd ransom.  Making matters worse, as he was traveling from out of town, he did not have any family members that could come and pay the ransom on his behalf. And, they refused to accept payment via credit/debit card so Plaintiff could not even have someone call and make the payment over the phone.

36.     What makes this outright malicious, if not criminal, is the fact that Hasan even refused to let Plaintiff have his prescription medication! Hasan could not be bothered by Plaintiff's desperate pleas for his medication which he was required to take every day and was already behind on due to him being jailed overnight.

37.     After his pleas to Hasan fell on deaf ears, Plaintiff left the Hyatt Hotel in a civilized manner albeit *understandably* and *justifiably* frustrated.

38.     Since he still had his room key and car keys, Plaintiff was able to access the garage and get his vehicle. After driving away from the hotel, he began approaching different stores and random strangers asking to use their phone, however, due to COVID-19, which had just recently started spreading rapidly, no one was willing to lend their phone.

39.     Plaintiff eventually ended up inside a Valero convenience store and the store manager allowed him to use the store's phone.

40.     Desperate, with no other viable option available, Plaintiff called 911 for help in getting his personal belongings back. However, after waiting for about an hour no policer officer came to assist him.

41.     Plaintiff started driving again and after traveling a short distance he came across a police officer.  However, the police officer explained that the Hyatt Hotel was outside his jurisdiction.

42.     As a result, Plaintiff drove back towards the Hyatt Hotel in order to try and get within "jurisdiction" and was able to use the phone at a small retail store nearby to call 911 again. However, after waiting for approximately another hour no one arrived.

43.     With no choice but to drive back home to Austin without his driver's license, wallet, medication, phones and his other personal belongings, Plaintiff decided to take a route that took him past the Hyatt Hotel so he could see if the officers had instead gone straight there.

44.     As Plaintiff approached the Hyatt Hotel, he saw that there was in fact a police vehicle parked outside the front of the hotel.

45.     Plaintiff parked his vehicle and voluntarily approached the officer.  He informed the officer that he had previously called 911 for assistance and explained that he needed their help in getting his personal belongings back.

46.     After asking for Plaintiff's name, one of the first things the officer said was, "*why did you threaten to kill her*?"

47.     As he stood there speechless and in disbelief, Plaintiff was placed under arrest, again.

48.     As he was being taken away, Plaintiff begged the officer to allow him to at least access his phone so he could retrieve two phone numbers.  The officer in turn asked Hasan who instead arrogantly refused and remarked "not until he pays the $1,000 fee", while clearly trying to conceal a pretentious smirk as if she found pleasure in Plaintiff's suffering.

49.     Turns out that shortly after Plaintiff had left the Hyatt Hotel after being refused access to belongings, Hasan contacted law enforcement and made wholly baseless and categorically false accusations that Plaintiff threatened to kill her. ***The recordings from the***

***security cameras in and around the area of the purported events will prove the allegations to be***
***fabricated.***

50.     Also, in order to further damage Plaintiff's character, Hasan falsely told the 911
operator that Plaintiff had been arrested the night before for robbing a store.

51.     As a result, the same day he was released, Plaintiff was put back in jail and charged
with allegedly making a "terroristic threat."

52.     After another roughly seventeen (17) humiliating hours in a jail cell, Plaintiff was
released on bond in downtown Houston.  By this point Plaintiff had been wearing the same clothes
for days, had slept in a jail cell two nights in a row, and had not been able to take his prescription
medication for days. To make matters even worse, his vehicle was towed while he was sitting in
jail.

53.     With no means of transportation, money, communication, and all the while in sheer
mental and emotional agony, Plaintiff spent hours walking around downtown begging for someone
to let him use a phone so he could call his mother who lived in Austin.  But, no one was willing to
do so due to COVID-19 fears compounded by his disheveled appearance.

54.     Finally, later that evening a gentleman who worked at a downtown area hotel
allowed Plaintiff to use his phone.  Plaintiff called his mother and asked her for help paying for a
room at that downtown hotel so he could have a place to rest for the night. However, he soon
realized that no hotel would allow him to check into a room without valid identification and
Plaintiff did not have his driver's license because Defendants had seized it.

55.     Not able to get a room, at or around midnight, Plaintiff continued to helplessly
wander around downtown until he eventually came across a security guard in a downtown parking
garage. The security guard took the time to listen to what Plaintiff had been through and allowed

Plaintiff to use his phone.  Using a mobile application on the security guard's phone, Plaintiff's mother was able to send money to get Plaintiff's vehicle out of the tow yard.

56.     The security guard agreed to drive Plaintiff to the tow yard after his shift ended at 8:00 AM. Since it was still only around 1:00 AM, Plaintiff searched for a safe place to get some rest and hopefully find some sleep in the meantime.  He ended up riding the downtown METRORail a few times but had to leave because sleeping for extended periods was not permitted on the trains.

57.     Shortly thereafter, Plaintiff found himself back at the parking garage with the security guard.  Feeling terrible for Plaintiff, the security guard directed him to a secluded area of the parking garage where Plaintiff could lay down and the security guard even so graciously offered his coat to Plaintiff to use as a makeshift pillow.

58.     Plaintiff spent the rest of the night laying on the floor of a parking garage.

59.     When the security guard's shift ended, he drove Plaintiff to the tow yard where Plaintiff's vehicle had been impounded.  However, the tow yard refused to release the vehicle because they also required valid identification in order to do so and Plaintiff did not have any because, as mentioned, Defendants had seized his driver's license.

60.     As a result, Plaintiff's mother, who suffers from excruciatingly painful and debilitating health conditions, was forced to drive three hours from Austin to the tow yard just to show her ID and get the vehicle released.

61.     Till this day, Defendants have refused to release any of Plaintiff's personal belongings.

62.     As a result of Defendants' unconscionable and unlawful actions, Plaintiff has suffered, continues to suffer, and will in the future suffer irreparable loss and injury, including but

not limited to economic loss, humiliation, embarrassment, emotional distress and mental anguish, feelings of racial stigmatization, an increased sense of vulnerability, and unlawful deprivation of his state and federally protected rights to exercise and enjoy equal treatment in the making and enforcing of contracts in places of public accommodation and having full access to and enjoyment of places of public accommodation without regard for race and/or color.

## VI.   CAUSE OF ACTION

### COUNT 1 - EQUAL RIGHTS UNDER THE LAW - § 1981

63.   Plaintiff incorporates the above paragraphs as if fully set forth herein.

64.   To make a claim for discrimination under § 1981, plaintiff need only show the following: "(1) that the plaintiff is a member of a racial minority, (2) an intent to discriminate on the basis of race by the defendant, and (3) the discrimination concerns one or more of the activities enumerated in the statute."  _Green v. State Bar of Tex._, 27 F.3d 1083 (5th Cir., 1994).

65.   Here, first, Plaintiff is an African American male; and therefore, is a member of a racial minority.  Second, there was an intent to discriminate against Plaintiff on the basis of his race.  Third, the discrimination concerned one or more activities enumerated in the statute.

66.   As a matter of law, "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to _make and enforce contracts_, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." _See_ 42 U.S.C. § 1981(a).

67.   For the purposes of § 1981, "the term 'make and enforce contracts' includes the making, performing, modification, and termination of contracts, and _the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship_." _See Id_. at (b).

68.     Here, Plaintiff was deprived of the enjoyment of all benefits, privileges, terms, and conditions of his contractual relationship with Hyatt Hotel.  Namely, Plaintiff was not allowed to enjoy the hotel amenities without being accused of wrongdoing based on him being African American.

## COUNT 2 - TITLE II OF THE CIVIL RIGHTS ACT

69.     Plaintiff incorporates the above paragraphs as if fully set forth herein.

70.     Title II provides, "all persons shall be entitled to full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation… without discrimination or segregation on the ground of race, color, religion, or national origin."  42. U.S.C.A. § 2000a; _Fahim v. Marriot Hotel Servs., Inc._, 551 F.3d 344, 349 (5th Cir. 2008).  To be precise, that would include "any inn, hotel, motel, or other establishment which provides lodging to transient guests." 42. U.S.C.A. § 2000a(b)(1).

71.     Thus, in the public accommodations' context, a plaintiff establishes a _prima facie_ case of discrimination by showing that he or she (1) is a member of a protected class; (2) attempted to exercise the right to full benefits and enjoyment of a place of public accommodation; (3) was denied those benefits and enjoyment; and (4) was treated less favorably than similarly situated persons who are not members of the protected class." _McCoy v. Homestead Studio_, 390 F. Supp.2d 577 (5th Cir., 2005) (citing _LaRoche v. Denny's Inc._, 62 F. Supp. 2d 1366, 1370 (S.D. Fla 1999)).

72.     Here, first, Plaintiff, as an African American male, is a member of a protected class.  Second, Plaintiff attempted to exercise his right to full benefits and enjoyment of the Hyatt Hotel.  Third, Plaintiff was denied those benefits and enjoyments.  Fourth, Plaintiff was treated less favorably than similarly situated persons who are not members of the protected class.  In other

words, Defendants grossly and unfairly treated him the way that they did because he was an African American male.

### COUNT 3 - PRIVATE ACTOR LIABILITY - § 1983

73.     Plaintiff incorporates the above paragraphs as if fully set forth herein.

74.     There are three elements of a § 1983 claim: "(1) a deprivation of a right secured by federal law (2) that occurred under color of state law, and (3) was caused by a state actor." *Victoria W. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004).

75.     To hold a private actor liable under § 1983, the plaintiff need only show that "the private citizen was a 'willful participant in joint activity with State or its agents.' *Priester v. Lowndes Cty.*, 354 F.3d 414, 420 (5th Cir., 2004) (quoting *Cinel v. Connick*, 15 F.3d 1338, 1342 (5th Cir. 1994)).  The plaintiff need only allege "(a) an agreement between the private and the public defendants to commit an illegal act and (b) a deprivation of constitutional rights." *Id*.

76.     More so, for "a private party [to] be liable as a state actor for filing a complaint with law enforcement" there should be allegations that the law enforcement officer "acted in accordance with a preconceived plan to take action merely because [the action] was designated… by the private party" and the officer "did so without independent investigation." *Michael v. Boutwell*, 138 F. Supp. 3d 761, 778 (N.D. Miss 2015) (quoting *Sims v. Jefferson Downs Racing Ass'n*, 788 F.2d 1068, 1078-79 (5th Cir. 1985).

77.     Here, Defendants were willful participants in joint activity with the State or its agents.  Namely, Wendy made false incriminating allegations against Plaintiff and accused him of being involved in a crime merely because he was the same race as the other suspects. This after he sought out her help so she could corroborate his defense that he was staying at the hotel alone (which was true). Additionally, she also pursued Plaintiff into the men's restroom, and commanded

him out.  Then, escorted him to the police who took him into custody without an independent investigation.

## COUNT FOUR - FALSE IMPRISONMENT

78.    Plaintiff incorporates the above paragraphs as if fully set forth herein.

79.    In Texas, the elements for a false imprisonment include: (a) willful detention, (2) without consent, and (3) without authority of law.  *Rogers v. City of Houston*, 627 S.W.3d 777 (Tex. App.-- 14th Dist., 2021) (citing *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002).

80.    Here, the Defendants directed, requested, or participated in Plaintiff's arrest on at least two separate occasions.  On the first, after Plaintiff notified Wendy of the events taking place in the parking garage, she baselessly accused Plaintiff of being involved and then demanded that he follow her to the police officers. She even pursued Plaintiff into the men's restroom demanding that he get out and issued several threats to Plaintiff.  She then proceeded to falsely accuse Plaintiff of being the getaway driver for the other women who were suspected of a crime.

81.    On the second occasion, the Defendants refused to return Plaintiff's property after he returned following his release from jail.  Even though, Plaintiff called the police himself, Defendants again directed, requested, or participated in the arrest of Plaintiff this second time.

## COUNT FIVE - CONVERSION

82.    Plaintiff incorporates the above paragraphs as if fully set forth herein.

83.    To establish a claim for conversion, a plaintiff must show (1) title, (2) right to possession, and (3) a demand for return of the property unless the possessor's acts manifest a clear repudiation of the plaintiff's rights.  *El Paso Production v. Valence Operating*, 112 S.W.3d 616 (Tex. App.-- Hou. [1st Dist.], 2003, pet. denied).

84.     Here, first, Plaintiff was the owner of several pieces of personal property that were in his hotel room including, but not limited to, his wallet, cash, prescription medication, jewelry, clothing, two mobile phones and other electronic devices.  Second, the Defendants unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with the rights of Plaintiff as the owner.  Third, Plaintiff demanded return of his personal property.  Fourth, Defendants refused to return the items and instead made false allegations against Plaintiff leading to his arrest.

### COUNT SIX - UNJUST ENRICHMENT

85.     Plaintiff incorporates the above paragraphs as if fully set forth herein.

86.     Unjust enrichment is an independent cause of action.  *Lee v. Lee*, 411 S.W.3d 95, 111 (Tex. App.— Hou. [1st Dist.]. 2013, no pet.); *Pepi Corp. v. Galliford*, 254 S.W.3d 457, 460 (Tex. App.— Hou. [1st Dist.], 2007, pet struck).  It occurs when a person has wrongfully secured a benefit or has passively received one which it would be unconscionable to retain.  *Id*., 111-113 (finding "more than a scintilla of evidence supports… unjust enrichment"); *see also Cohen v. Tour Partners*, Ltd., No. 01-15-00705-CV (Tex. App.— Hou. [1st Dist.], Apr. 27, 2017).

87.     The elements include as follows: (1) defendant gained a benefit, (2) at the expense of the plaintiff, and (3) retention of that benefit is shown to be unjust.  *See* Restatement (Third of Restitution and Unjust Enrichment) § 1 cmt. A (2011).

88.     Here, first, Defendant gained the benefit of Plaintiff's personal belongings which included cash, wallet, jewelry and several other valuable electronic devices.  The retention of those benefits would be unjust.  In addition, Plaintiff paid to stay in a hotel, not jail.  So, the retention of those monies he paid to the hotel for a room would be grossly unjust.

## COUNT SEVEN - BREACH OF CONTRACT

89.     Plaintiff incorporates the above paragraphs as if fully set forth herein.

90.     For a breach of contract action, a plaintiff need only show (1) the existence of a valid contract; (2) its own performance or tendered performance; (3) a breach of the contract; and (4) damages sustained as a result of the breach.  *See B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 16 (Tex. App.-- Hou.[1st Dist.] 2009, pet. denied) (citing *Valero Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 351 (Tex. App.-- Hou.[1st Dist.] 2001, no pet.)). "A breach of contract occurs when a party fails or refuses to do something he has promised to do." *Id*. (quoting *Mays v. Pierce*, 203 S.W.3d 564, 575 (Tex. App.-- Hou. [14th Dist.] 2006, pet. denied)).

91.     Here, first, there was a valid contract between Plaintiff and Defendants.  Namely, that for good and just consideration, Plaintiff could stay at the hotel and have full access to and enjoyment of places of accommodation at the Hyatt Hotel.  Second, Plaintiff tendered payment.  Third, Defendants caused Plaintiff to stay in jail overnight instead thereby materially breaching the contract.  Fourth, as a result, Plaintiff suffered damages.

## COUNT EIGHT – DEFAMATION

92.     Plaintiff incorporates the above paragraphs as if fully set forth herein.

93.     To show defamation claim, plaintiff need only show:  (1) the defendant published a false statement; (2) that defamed the plaintiff; (3) with the requisite degree of fault regarding the statement's truth; and (4) damages, unless the statement constitutes defamation per se.  *Bedford v. Spassoff*, 520 S.W.3d 901, 904 (Tex. 2017)

94.     Here, Defendant Wendy and Hasan's slanderous claims are without question, on solid ground for supporting a judgment against the Defendants.

95.     Wendy made oral statements to third persons, including but not limited to police officers, alleging that Plaintiff was associated and was the getaway driver for the other African American women suspected of theft.

96.     Hasan made false oral statements to third persons claiming that Plaintiff threatened to kill her and that he had been arrested for theft.

97.     Each time such defamatory statements were uttered, Plaintiff was caused immeasurable ongoing injuries.

**COUNT NINE - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

98.     Plaintiff incorporates the above paragraphs as if fully set forth herein.

99.     In Texas, the elements to an intentional infliction of emotional distress claim include: (1) defendant acted intentionally or recklessly; (2) defendant's conduct was extreme and outrageous, (3) defendant's actions caused the plaintiff emotional distress, and (4) the plaintiff's emotional distress was severe. _Tex. Farm Bureau Mut. Ins. Co. v. Sears_, 84 S.W.3d 604, 610 (Tex. 2002).

100.     Here, Defendants acted intentionally or recklessly when they made false allegations against Plaintiff to the police. Second, the Defendants' conduct was extreme and outrageous.  Till this day, Defendants have intentionally withheld and refused to release to Plaintiff any of his personal belongings even though he was not responsible for the "police presence" at the hotel. As for Wendy, she falsely accused Plaintiff of being the getaway driver in a crime merely based on the fact that Plaintiff was African American, like the women suspected of the crime. Hasan also made false accusations against Plaintiff to the authorities and further alleged that he had been arrested for theft the day before in order to create urgency and make her more credible.

101.    The Defendants' actions caused Plaintiff to suffer severe ongoing emotional distress.

### COUNT TEN - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

102.    Plaintiff incorporates the above paragraphs as if fully set forth herein.

103.    Plaintiff asserts his negligent infliction of emotional distress cause of action against the Defendants, in addition to or in the alternative to, Plaintiff's foregoing intentional infliction of emotional distress cause of action.

104.    As a paying customer, the Defendants owed Plaintiff a duty to allow him to enjoy the benefits of his room and public accommodations at the Hyatt Hotel during his stay without subjecting him to racial discrimination and holding his personal belonging for a ransom.

105.    The Defendants negligently breached that duty when they made false incriminating allegations against Plaintiff resulting in him being jailed and then, again, when they refused to release his personal belonging. Plaintiff suffered severe emotional distress as a result of the Defendants' negligent acts and omissions.

### COUNT ELEVEN - VICARIOUS LIABILITY / RESPONDEAT SUPERIOR

106.    Plaintiff incorporates the above paragraphs as if fully set forth herein.

107.    Vicarious liability is a judicially created method for enforcing remedies for wrongs committed.  *See Dutcher v. Owens*, 647 S.W.2d 948, 950-951 (Tex. 1983) (*citing Newspapers, Inc. v. Love*, 380 S.W.2d 582, 588-89 (Tex. 1964)).  Vicarious liability principles impute liability arising from the conduct of an active tortfeasor to another party based upon a relationship between them.  *See, e.g., Garza v. Exel Logistics, Inc.*, 161 S.W.3d 473, 481 (Tex. 2005) (citing *Wingfoot Enters., v. Alvarado*, 111 S.W.3d 134, 146 (Tex. 2003)); *see also St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 540 (Tex. 2002) (plurality) ("The common law has long recognized that liability for

one person's fault may be imputed to another who is himself entirely without fault solely because of the relationship between them.").

108.    Specifically, to hold a defendant vicariously liable under respondeat superior, the plaintiff need only show that the tortfeasor was an employee of the defendant.  *Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947 (Tex. 1998).  Here, first, Hyatt Corporation, OPCO and/or GP are vicariously liable for the acts and omissions of Wendy and Hasan.

### COUNT 10 - SPOLIATION / PRESERVATION OF EVIDENCE

109.    Plaintiff incorporates the above paragraphs as if fully set forth herein.

110.    Spoliation of evidence "is the destruction or the significant and meaningful alternation of evidence.  *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 569 (5th Cir. 1996).   A party's duty to preserve evidence comes into being when the party has notice that the evidence is relevant or should have known that the evidence may be relevant.  *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F.Supp.2d 598, 612 (S.D. Tex. 2010).

111.    Under state law, in Texas, the proper inquiry is (1) whether there was a duty to preserve evidence, (2) whether the alleged spoliating party breached that duty to preserve evidence; and (3) whether the spoliation prejudiced the non-spoliating party's ability to present its case or defense.  *Miner Dederick Construction, LLP v. Gulf Chemical & Mettallurgical Corp.*, 403 S.W.3d 451, 465 (Tex. App.-Houston [1st. Dist.] 2013, pet. denied).

112.    Here, the Defendants were under the duty to preserve all video recordings depicting the events made the basis of this lawsuit because they are directly related to both times they called law enforcement and made criminal allegations against Plaintiff.  As such, they were well aware that there would be an investigation into the allegations and therefore the necessity to preserve the recordings. More specifically, Wendy, the manager on duty on May 20, 2021, was explicitly told

by the investigating officer to preserve all the security video footage. Further, Plaintiff's defense counsel representing him in the related criminal matters subpoenaed the relevant security footage from the Hyatt Hotel thereby putting the Defendants on undeniable notice to preserve the security camera footage, however, per information and belief, they have refused to comply with the subpoena. As such, there can be no defense from Defendants that it had no duty to preserve the security camera footage.

## VII.   DAMAGES

113.   Defendants are jointly and severally liable for the wrongs complained of herein, either by virtue of direct participation or by virtue of ordering, encouraging, aiding, abetting, committing, and/or ratifying and condoning the commission of the above described acts and/or omissions.

114.   Plaintiff suffered compensatory, special, and punitive damages for the following:

      a.     Extreme mental anguish and emotional distress; and

      b.     Violations of Plaintiff's civil rights by the Defendants.

115.   Plaintiff is seeking punitive damages for the unconscionable acts and omissions of the Defendants as well.

## VIII.   JURY DEMAND

116.   Plaintiff respectfully demands that this action be heard before a jury.

## IX.   PRAYER

For all the foregoing reasons, Plaintiff Quincy Gordon prays that the Honorable Court enter a judgment against all Defendants jointly, severally and in solidarity, as follows:

      a.    Compensatory damages;

      b.    special and punitive damages;

c.  the costs of suit;

d.  reasonable and necessary attorneys' fees as provided by 42 U.S.C. §1988;

e.  prejudgment and post-judgment interest at the highest rates permitted by law;

f.  trial by jury; and

g.  such other and further relief, at law or in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

THE SHARIFF LAW FIRM

By: _____
        **M. Obaid Shariff**
        Federal I.D. No. 2827312
        Texas Bar No. 24091135
        2500 West Loop South, Suite 300
        Houston, Texas 77027
        (713) 244-8392 (Telephone)
        (713) 244-8372 (Fax)
        mshariff@sharifflawfirm.com
        **ELECTRONIC SERVICE VIA:**
        eservice@sharifflawfirm.com

        **ATTORNEY FOR PLAINTIFF
        QUINCY GORDON**

22